UNITED STATES v. CHICAGO, M. & ST. P. RY. CO.

(Circuit Court, N. D. Iowa, E. D.   December 4, 1906.)

No. 233.

1. PUBLIC LANDS—SWAMP LAND GRANT—SELECTION OF LANDS.

The swamp land grant to the states of September 28, 1850 (9 Stat. 519, c. 84), did not attach to any particular lands passing thereunder, until they had been identified as swamp lands by the Secretary of the Interior or other competent authority of the United States.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 41, Public Lands, § 186.]

2. SAME—RAILROAD GRANT—EXCEPTION OF LANDS RESERVED.

At the time of the passage of Act May 12, 1864, c. 84 (13 Stat. 72), granting lands to the state of Iowa to aid in the construction of the McGregor Western Railroad, and also at the time of the filing of the map of the definite location of the road, certain of the lands within the place limits of the grant as so fixed were embraced in lists of lands selected by agents of the state as swamp lands, under the swamp land grant of September 28, 1850 (9 Stat. 519, c. 84), which lists had been made and filed in the Interior Department for approval subsequent to the passage of Act March 3, 1857, c. 117, 11 Stat. 251, which approved all such selections previously made. At the time of the filing of the map of definite location such selections had not been acted upon, but they were subsequently disapproved by the Commissioner of the General Land Office, who held, after a hearing pursuant to law, that the lands were not swamp lands and did not pass under the act, which decision was not appealed from nor reversed. *Held,* that the mere selection and filing of the lists by the state agents did not operate to segregate such lands from the public lands of the United States nor prevent their passing under the railroad grant as within an exception of "lands reserved by the United States for any purpose whatever."

[Ed. Note.—For cases in point, see Cent. Dig. vol. 41, Public Lands, §§ 186, 240.]

In Equity.   On final hearing.

By this suit the United States seeks a discovery, an accounting, and to recover of the defendant under Act Cong. March 3, 1887, c. 376, 24 Stat. 556 [U. S. Comp. St. 1901, p. 1595], and Act March 2, 1896, c. 39, 29 Stat. 42 [U. S. Comp. St. 1901, p. 1603], the value of some 4,300 acres of public lands, which are particularly described in the bill of complaint, in Dickinson, Kossuth, and Palo Alto counties, in this state, which it is alleged were prior to said act of 1887, erroneously patented by the officers of the Interior Department to the state of Iowa for the benefit of the defendant railway company, and by said state patented to defendant, as inuring to it under the act of Congress approved May 12, 1864 (13 Stat. 72, c. 84), entitled, "An act for a grant of lands to the state of Iowa in alternate sections to aid in the construction of a railroad in said state," and prior to the act of March 2, 1896, sold by the defendant to numerous persons who were good faith purchasers thereof for value. By said act of May 12, 1864, it is provided that there is hereby granted to the state of Iowa, for the benefit of the McGregor Western Railroad Company, to aid in the construction of a railroad in said state from South McGregor, in a westerly direction on or near the forty-third parallel of north latitude until it shall intersect in O'Brien county, a railroad running from Sioux City to the Minnesota state line, every alternate section of land designated by odd numbers for 10 sections in width on each side of said road; but in case it shall appear, when the line of said road is definitely located, that the United States have sold any section or part thereof granted as aforesaid, or that the right of pre-emption, or homestead settlement has attached to any of said land, or that any of the same has been reserved by the United States for any purpose

whatever, then it shall be the duty of the Secretary of the Interior to cause to be selected for the purposes aforesaid from the public lands of the United States, within specified limits, so much land in alternate sections designated by odd numbers as shall be equal to such land as the United States have sold, reserved, or otherwise appropriated, or to which the right of homestead settlement or pre-emption has attached, provided, that any and all lands heretofore reserved to the United States by any act of Congress, or in any other manner by competent authority, for the purpose of aiding in any object of internal improvement or other purpose whatever, be and the same are hereby reserved and excepted from the operation of this act. The act further provides that the lands granted shall be subject to the disposal of the Legislature of Iowa for the purpose aforesaid and no other; that, if said McGregor Western Railroad Company or assigns shall fail to construct such road, the state of Iowa may resume said grant and so dispose of the same as to secure the completion of a road on such line, upon such terms and within such time, not exceeding 15 years from the acceptance of the grant, as it shall determine; and that all lands which by said grant shall remain to the United States within 10 miles on each side of said road shall when sold be sold for not less than double the minimum price of public land. It is alleged in the bill that the defendant has succeeded to the rights of the McGregor Western Railroad Company under said grant, and that at the time of the definite location of said railroad the lands described, being within 10 miles of said road on either side thereof, were covered by existing claims of record in the office of the Commissioner of the General Land Office, consisting of homestead entries, pre-emption declaratory statements, warrant locations, or swamp selections which were all pending before the Department of the Interior for adjudication at the time of the attachment of rights under said railroad grant, and that said lands were therefore excepted from the operation of said grant. The answer admits that defendant has succeeded to the rights of the McGregor Western Railroad Company under said grant, and that the lands have been patented to it as such successor, but denies that said lands were covered by any such claims, or were excepted from the operation of the grant.

From the pleadings and stipulations of the parties it appears:

(1) That the McGregor Western Railroad Company duly accepted the terms of said grant, and on August 30, 1864, filed in the office of the Secretary of the Interior a map of definite location of the line of its railroad along the prescribed route to a point of intersection in O'Brien county, with said railroad running from Sioux City to the state line of Minnesota, and completed a part of said road, but it and its assigns failed to comply with all of the terms of said grant; that the Legislature of Iowa thereupon resumed the grant, and by chapter 21, p. 18, of the Acts of the 17th General Assembly of that state, approved February 27, 1878, conferred the same upon the Chicago, Milwaukee & St. Paul Railway Company, the defendant herein; that defendant accepted the grant and constructed the road to the point of intersection in O'Brien county, with said road running from Sioux City to the state line of Minnesota, within the time fixed therefor; that in 1880 the United States, by its proper officers, in recognition of the right of the defendant to the lands embraced in said grant, patented the same, including the lands described in the bill, except 200 acres thereof, to the state of Iowa for the benefit of the defendant; and that the state of Iowa in the years 1880 and 1881, in like recognition of defendant's right to said land, duly patented the same, except said 200 acres, to the defendant as inuring to it under said act of May 12, 1864.

(2) That about November 21, 1850, the Commissioner of the General Land Office duly instructed the United States Surveyor General for the state of Iowa to make out lists of all the lands granted to said state by the act of Congress of September 28, 1850 (9 Stat. 519, c. 84), the swamp land grant, and in his letter of instruction said: "The only reliable data in your possession from which these lists can be made are the field notes of the surveyors on file in your office, and, if the authorities of the state are willing to adopt these as the basis of these lists, you will so regard them. If not, and these authorities furnish you satisfactory evidence that any lands are of the character embraced in the grant, you will report them." On June 23, 1860, the Commissioner of the General Land Office sent to said Surveyor General for Iowa, a letter as

follows: "Sir: Referring to your letter of the 15th inst., asking to be advised as to your duty in reporting swamp selections in Iowa, and in view of the act of the 12th of March last, a copy of which was furnished you in my letter of the 21st ult., I will here set forth the principles which you are to apply to any selections now on your files and to all others, also, which may hereafter be reported to you by the agents of the state: (1) As the grant contemplates the inundation of extensive regions of country by such natural arteries as the Mississippi river, land evidently intended to be granted as swamps are those only which by reason of their swampy character and liability to overflow, are worthless in their natural condition, and whereon crops cannot be raised without reclamation by levees and drains. An overflow or inundation from casual cause merely temporary in its effects does not bring the land within the grant, and cannot be said in any proper sense to render them "unfit for cultivation." The law contemplates such long continued overflow or freshets only, as would totally destroy crops and prevent the raising of them without artificial means, by levees, etc., such as are found on the Mississippi river. (2) Bodies of land covered by shallow lakes or ponds which may become dry by evaporation or other natural causes do not come within the meaning of the swamp grant. (3) Testimony now, after the lapse of nine years, to be available, must be explicit, resting upon the personal and exact knowledge of the localities claimed, and must relate to each quarter, quarter section, or other equivalent legal subdivision. This testimony must be made by parties having no interest, present or prospective, direct or indirect, and must state the name of the river or water course whereby the lands are submerged and rendered useless for arable purposes in their natural condition. (4) I inclose herewith a blank form of proof which you will require from the state authorities, and if lists of lands of this class are furnished you, accompanied with such evidence, you will report them to this office, in the manner set forth in form 'B' herewith, after making careful examination of said proof, and rendering your own decision thereon, as to whether the several tracts are swamp or not within the meaning of the grant. (5) You will, as soon as your report is arranged and prepared for transmission to this office, send simultaneously a copy thereof to the local offices of the proper land districts, with instructions to them to enter the tracts in the usual form in their books, and to withhold them from sale or other disposition, unless otherwise especially directed by this office." The form of proof inclosed in the letter appears in the record. The Surveyor General made no further report to the Commissioner of the General Land Office as to swamp land selections in either of the said counties, and gave no directions to any of the local land offices to withhold any of said lands from sale or other disposition as required by said letter of the Commissioner.

(3) That prior to and on August 30, 1864, when the map of definite location of said road was filed in the office of the Secretary of the Interior, none of the lands described in the bill of complaint was covered by any homestead entry, pre-emption declaratory statements, warrant locations, or other existing claims of record in the office of the Commissioner of the General Land Office, save and except: (a) That on August 25, 1859, there was received and filed in that office, from the United States Surveyor General for Iowa, a certified transcript of a list of lands in Kossuth county on file in his office, including the lands described in the bill of complaint as being in that county, purporting to have been selected as swamp lands by Wm. H. Ingham and Geo. A. Lowe, acting under appointment of the county court of said county for that purpose. To the original list is attached the affidavit of said Ingham and Lowe sworn to November 11, 1858, before the county judge stating that they were surveyors appointed to select swamp lands in Kossuth county, and that the lands mentioned in said list were swamp lands. (b) That on April 3, 1860, there was received and filed in that office from the United States Surveyor General for Iowa a like list of lands in Palo Alto county, on file in his office, including those described in the bill of complaint, except 40 acres thereof, as being in that county, purporting to have been selected as swamp lands by Andrew Hood. The Surveyor General certifies that each of the foregoing lists transmitted by him is a correct transcript of the original list of swamp selec-

tions made by the county surveyor or the state locating agent and filed in his office. (c) That the records of said General Land Office further show that on March 23, 1872, there was on file in said office a list of lands in Dickinson county purporting to have been selected as swamp lands by Benjamin F. Parmenter, appointed by the county court of that county in 1857 to make such selections, which list is sworn to by Parmenter before the county judge of Dickinson county July 23, 1860, and is indorsed, "Posted in tract book May 28th, 1872," but no prior record of any kind appears in regard thereto, nor does it appear who transmitted the list to the General Land Office. That neither of said lists was ever adopted, ratified, or confirmed in any manner by the Interior or Land Department of the United States; but said counties continued to claim said lands as swamp and as having been selected as such by or for them under authority of an act of the General Assembly of Iowa approved January 13, 1853, and said McGregor Western Railroad Company and its successors in interest successively made claim to said lands as inuring to said companies, respectively, under said act of Congress of May 12, 1864. That on May 31 and October 21, 1876, the Commissioner of the General Land Office upon public hearings of the matter of such claims, after due notice to all parties interested, held and adjudged in writing that the lands described in said list were not, in fact, swamp lands, nor embraced in said act of Congress of September 28, 1850, and that the state of Iowa and said several counties were never entitled to said lands or any part thereof under said act. That said hearings were pursuant to the act of Congress of March 5, 1872 (17 Stat. 37, c. 39), and said findings and decisions of said Commissioner were never appealed from, reversed, or modified in any manner.

(4) That the lands described in the bill of complaint are of the alternate sections and parts thereof designated by odd numbers within 10 sections in width on each side of the line of the definite location of said McGregor Western Railroad, and were, except 200 acres thereof, prior to March 2, 1896, sold and duly conveyed by the defendant company to numerous persons who bought the same in good faith and for value; and on October 21, 1898, the Secretary of the Interior held in writing that the titles of all of the purchasers of said lands were confirmed in them, respectively, under the terms of the act of Congress approved March 2, 1896 (29 Stat. 42, c. 39 [U. S. Comp. St. 1901, p. 1603]). That due demands were made upon defendant, by direction of the Secretary of the Interior, that it reconvey to the United States all of the lands described in the bill of complaint, and that it pay to the United States the government price of $2.50 per acre for the said lands, and that defendant has failed to comply with either of said demands.

(5) That the defendant railway company did not receive from the United States, either directly or through the state of Iowa, the full quota of lands to which it was lawfully entitled under said grant of May 12, 1864, and that such deficiency is considerably more than the total acreage of all the lands in controversy in this suit.

H. G. McMillan, U. S. Atty., and George Crane, Asst. U. S. Atty. Charles B. Keeler and W. J. Knight, for defendant.

REED, District Judge (after stating the facts). The principal question for determination is: Were the lands described in the bill of complaint and patented to the defendant reserved, or excepted from the operation of the grant of May 12, 1864? That grant is of every alternate section of land designated by odd numbers within 10 sections in width on each side of the line of road of the McGregor Western Railroad Company as it shall be definitely located; and three classes of lands are excepted from its operation, viz.: (1) Those which at the time of the definite location of the road have been sold by the United States; (2) those to which the right of pre-emption or homestead settlement has then attached; and (3) those which may then have been reserved to the United States by any act of Congress, or in any other manner

by competent authority for any other purpose whatever. The map of definite location of the road was filed August 30, 1864. The specific lands granted were then identified, and to them the title of the company attached as of May 12th of that year. Under the facts as stipulated by the parties none of the lands in question had been sold by the United States, nor had the right of pre-emption or homestead settlement attached to any of them at the time the road was located; and they are not, therefore, within the first or second classes of the exceptions.

It is also agreed that none of them was in fact of the character of lands embraced in the swamp land grant of September 28, 1850. This was finally determined by the Commissioner of the General Land Office in 1876. That finding was not appealed from, has never been modified in any way, and is not challenged by either of the parties to this suit, but is relied upon by both as sustaining their respective contentions. The contention of the government is that, as the lands were claimed to have been swamp lands by the several counties prior to the time the road was located, they were excepted from the operation of the grant, and that inasmuch as it was adjudged by the proper authority, after the location of the road, that they were not in fact swamp lands, they remained a part of the public domain and were, therefore, erroneously patented to the defendant. The contention of the defendant is that the lands were never selected as swamp by any competent authority of the United States, or reserved as such by any act of Congress, and therefore passed under the grant of May 12th, and were rightly patented to it.

The finding of the Land Department that the lands were not swamp is conclusive upon that question of fact, in the absence of fraud or mistake. But, if the lists filed by the respective counties were legally sufficient to segregate the lands from the public domain, the determination by the Land Department that they were not would be the determination of a legal question which would be subject to review by the courts. The various grants of public lands by Congress for railroad and other purposes, and the exceptions or reservations contained in such grants, have been the subject of frequent consideration by the Supreme Court of the United States; but in none of the cases does the precise question presented by this record, seem to have been determined. It is held by that court, however, that where lands within the limits of congressional grants similar to the one in question were at the time of the taking effect thereof covered by pre-emption or homestead entries under the land laws of the United States, or had been granted by other acts of Congress, or reserved by other competent authority for other purposes, such lands were excluded from the operation of the grant, though the entries may have been defective or invalid, or the grantees in other grants had failed to comply with the terms thereof, so that in each case the lands reverted to the United States subsequent to the location of the railroad, and again became a part of the public domain. But in all of these cases it appears that the pre-emption or homestead entry or other claim had been accepted or recognized by the proper officers of the Land Department as having attached to the lands, or that the lands were, in fact, embraced within

prior acts of Congress, or reserved for other purposes by other competent authority acting for or on behalf of the United States.    Thus in. Whitney v. Taylor, 158 U. S. 85, 15 Sup. Ct. 796, 39 L. Ed. 906, the map of definite location of a land grant railroad was filed in March, 1861, and the road completed in 1868.    In May, 1857, a pre-emption claim upon the land in controversy was filed in the proper land office and duly entered upon its books, which entry so remained until 1885, when it was canceled by the Land Department.    In 1888 the defendant entered the land as a homestead, subsequently commuted that entry, made final proofs, paid for the land, and received the usual government receipt therefor.    The plaintiff claimed under mesne conveyance from the railroad company.    The title of the defendant prevailed, for the reason that the pre-emption claim, having been accepted by the proper local land office prior to the location of the road, had thereby attached to the land and thus excluded it from the operation of the grant to the railroad company.    In the opinion it is distinctly held that to have such effect the pre-emption or other claim must be one that is made under the authority of the laws of the United States and accepted or recognized by the proper land office, or other authority as being a valid one, though it may in fact have been defective or invalid.    After reviewing its prior decisions, the court says:

"Although these cases are none of them exactly like the one before us, yet the principle to be deduced from them is that when, on the records of the local land office, there is an existing claim on the part of an individual under the homestead or pre-emption law which has been recognized by the officers of the government, and has not been canceled or set aside, the tract in respect to which that claim is existing is excepted from the operation of a railroad land grant containing the ordinary excepting clause, and this notwithstanding such claim may not be enforceable by the claimant, and is subject to cancellation by the government at its own suggestion, or upon the application of other parties. * * * In this respect notice may also be taken of the rule prevailing in the Land Department where the filing of the declaratory statement is recognized as the assertion of a pre-emption claim which excepts a tract from the scope of a railroad grant like this."

Railroad Co. v. Whitney, 132 U. S. 357, 10 Sup. Ct. 112, 33 L. Ed. 363, differs from the preceding case only in the fact that the entry accepted by the local land office was a homestead, instead of a pre-emption entry.    After stating the essential requisites of a valid homestead entry, and that if it is defective in either of these essentials, the local land office is justified in rejecting it, the court says:

"But if, notwithstanding these defects, the application is allowed by the land officers, and a certificate of entry is delivered to the applicant, and the entry is made of record, such entry may be afterwards canceled on account of these defects. * * * But these defects, whether they be of form or substance, by no means render the entry a nullity. So long as it remains a subsisting entry of record, whose legality has been passed upon by the land authorities, and their action remains unreversed, it is such an appropriation of the tract as segregates it from the public domain, and therefore precludes it from subsequent grants."

In Newhall v. Sanger, 92 U. S. 761, 23 L. Ed. 769, it is held that the existance of an alleged Mexican grant of lands, the validity of which was pending at the time of the definite location of a land grant railroad before the tribunal created by Congress to determine the va-

lidity of such grant, was sufficient to exclude lands within its boundaries from the operation of the railroad grant, such lands having been reserved by Congress from sale or other disposition pending the investigation of the Mexican grant, which was finally adjudged invalid shortly after the location of the railroad. In Leavenworth R. R. Co. v. United States, 92 U. S. 733, 23 L. Ed. 634, lands reserved to the Osage Indians by treaty made with them prior to a railroad grant, though not specifically reserved in said grant, were held to be reserved from its operation by force of a proviso excepting "the lands heretofore reserved to the United States, by any act of Congress, or in any other manner by competent authority, * * * or for any other purpose whatever." In United States v. Southern Pacific Railroad Co., 146 U. S. 570, 13 Sup. Ct. 152, 36 L. Ed. 1091, it is held that the filing of the map of definite location by the Atlantic & Pacific Company, under the act of July 27, 1866, granting lands to that company, when approved by the Secretary of the Interior, operated to withdraw the lands granted from the public lands of the United States, so that they did not pass under the subsequent grant of March 3, 1871, to the Southern Pacific Company, though the Atlantic & Pacific Company failed to comply with its grant, and it was forfeited and the lands restored to the United States by Congress in 1886, after the grant to the Southern Pacific Company had taken effect.

In Railway Company v. Dunmeyer, 113 U. S. 629, 5 Sup. Ct. 566, 28 L. Ed. 1122, it is said:

"The reasonable purpose of the government undoubtedly is that which is expressed, namely, while we are giving liberally to the railroad company, we do not give any lands which we have already sold, or to which, according to our laws, we have permitted a pre-emption or homestead right to attach."

The rule is again announced in the recent case of the Southern Pacific Company v. United States (No. 2) 200 U. S. 354, 26 Sup. Ct. 298, 50 L. Ed. 512.

It is thus settled that to segregate lands from the public domain, so that they may not pass under subsequent grants by Congress, they must have been previously reserved or withdrawn from sale by competent authority acting for or on behalf of the United States. Were the lands in question so reserved or withdrawn as being swamp lands? By the swamp land grant the Secretary of the Interior is charged with the duty of selecting and making lists of all lands embraced within the grant, and causing patents to be issued therefor to the several states in which they are located, and on the issuance of such patents the title to the lands vests in the state. On November 21, 1850, the Commissioner of the General Land Office directed the Surveyor General for Iowa to make out a list of all the lands so granted to the state of Iowa, and in his letter said:

"The only reliable data in your possession from which these lists can be made are the field notes of the surveyors on file in your office, and, if the authorities of the state are willing to adopt these as a basis of the lists, you will so regard them. If not, and they furnish you satisfactory evidence that any lands are of the character embraced in the grant, you will report them."

This is an explicit direction by the Land Department to select in the first instance as swamp the lands which the field notes of the surveyors

show to be of that character, and, if the state authorities are unwilling to adopt these as the basis of the selection and will furnish satisfactory evidence that any other lands are embraced in the grant, the evidence so furnished is to be reported by the Surveyor General to the Land Department, thus making any selections that might be made by the state authorities subject to the approval of the Land Department. It does not appear what the field notes show as to the character of the lands in question further than is to be inferred from the final determination that the lands were not, in fact, swamp.

In 1853 the state of Iowa, by act of its General Assembly, granted to the several counties of the state the swamp lands in said counties embraced in the swamp land grant, and authorized the county courts of each of the counties to appoint competent persons to examine the lands and make due report and plats of the swamp lands therein to such court, which courts were required to transmit to the proper officers lists of the lands so selected in order to procure the proper recognition of the same on the part of the United States. Laws Iowa 1852–53, p. 29, c. 13. It would thus appear that the state authorities were unwilling to adopt the field notes of the surveyors as the proper basis for the selection of the swamp lands in that state, and undertook themselves to make and furnish lists of such lands. But it is plain that the lists furnished by the state authorities would be without effect to withdraw or segregate the lands therein described from the public lands of the United States, unless they were approved by the Secretary of the Interior, or other competent authority of the United States. Railroad Co. v. Price Co., 133 U. S. 196–511, 512, 10 Sup. Ct. 341, 33 L. Ed. 687; Humbird v. Avery, 195 U. S. 480, 507–508, 25 Sup. Ct. 123, 49 L. Ed. 286; Sjoli v. Dreschel, 199 U. S. 564–569, 26 Sup. Ct. 154, 50 L. Ed. 311. The fact that these lists were presented to the Surveyor General and transmitted to the General Land Office by him is not important; for his authority was expressly limited by his instructions to making lists from the field notes of the surveyors, and to reporting any evidence that might be furnished by the state authorities as to the character of the lands. The Secretary of the Interior only was authorized primarily to identify what lands were embraced within the swamp land grant. French v. Fyan, 93 U. S. 169, 23 L. Ed. 812; Barden v. Northern Pacific Ry. Co., 154 U. S. 288–320, 14 Sup. Ct. 1030, 38 L. Ed. 992; Rogers Locomotive Works v. American Emigrant Co., 164 U. S. 559–574, 17 Sup. Ct. 188, 41 L. Ed. 552. In the last-named case the locomotive works claimed certain lands in Calhoun county, this state, under the railroad grant of 1856; and the emigrant company claimed the same lands under conveyance from Calhoun county as swamp lands. In holding that the title passed under the railroad grant the court, among other things, said:

"In French v. Fyan, 93 U. S. 169, 23 L. Ed. 812, this court decided that by the second section of the swamp land act the power and duty devolved upon the Secretary of the Interior as the head of the Land Department of determining what lands were of the description granted by that act and made his office the tribunal whose decision on that subject was to be controlling. The identification of lands as lands embraced by the swamp land act was therefore necessary before the state could claim a patent, or exercise absolute control of them. * * * The emigrant company lays much stress upon that clause of

the railroad act of 1856 exempting from its operation all lands previously reserved by the United States for any purpose. And upon this foundation it rests the contention that no lands embraced by the swamp land act of 1850 could, under any circumstances, be withdrawn by the Land Department from its operation, and certified to the state under the railroad act of 1856. This contention assumes that the lands in controversy were, within the meaning of the act of 1850, swamp and overflowed lands. But that fact was to be determined in the first instance by the Secretary of the Interior. It belonged to him primarily to identify all lands that were to go to the state under the act of 1850. When he made such identification, then, and not before, the state was entitled to a patent.

By the act of March 3, 1857 (11 Stat. 251, c. 117), it is provided:

"That the selection of swamp and overflowed lands granted to the several states by the act of September 28th, 1850, heretofore made and reported to the Commissioner of the General Land Office so far as the same shall remain vacant and unappropriated, be and are hereby confirmed, and shall be approved and patented to the several states in conformity with the provisions of the act aforesaid."

This act is expressly limited to such selections as had theretofore been made, and is a recognition by Congress of the necessity of the approval of such selections by competent authority of the United States before they are of any effect. No other act of Congress prior to August 30, 1864, refers to or recognizes in any manner any lists furnished by state authority, and from the stipulation of facts it appears that none of the lists filed by the respective counties in this case was ever adopted, ratified, or confirmed in any manner by the Interior or Land Departments of the United States. These lists were not, therefore, prior to August 30, 1864, accepted or recognized for any purpose by any competent authority acting for or on behalf of the United States.

But it also appears from the stipulation of facts that the Kossuth county list was filed in the General Land Office August 25, 1859, that of Palo Alto county April 3, 1860, and that of Dickinson county was sworn to before the county judge of that county July 23, 1860, but it does not appear when or how it reached the Land Department. On June 23, 1860, the Commissioner of the General Land Office transmitted to the Surveyor General of Iowa a letter in which, among other things, he said:

"Referring to your letter of the 15th inst., asking to be advised as to your duty in reporting swamp land selections in Iowa, and in view of the act of the 12th of March last, a copy of which was furnished you in my letter of the 21st ult., I will here set forth the principles which you are to apply to any selections now on your files and to all others, also, which may hereafter be reported to you by agents of the state. Testimony now, after the lapse of nine years, to be available, must be explicit, resting upon the personal and exact knowledge of the localities claimed, and must relate to each quarter, quarter section, or other equivalent legal subdivision. This testimony must be made by parties having no interest, present or prospective, direct or indirect, and must state the name of the river or water course whereby the lands are submerged and rendered useless for arable purposes in their natural condition. * * * You will, as soon as your report is arranged and prepared for transmission to this office, send simultaneously a copy thereof to the local offices of the proper land districts, with instructions to them to enter the tracts in the usual form in their books, and withhold them from sale or other disposition, unless otherwise especially directed by this office."

The act of March 12th, to which reference is made in this letter, fixes the time within which the selections shall be made (12 Stat. 3, c. 5), and no doubt prompted the letter of the 21st ult., referred to. A form of the proofs required of the state authorities is inclosed with the letter of June 23, 1860, but the lists furnished by the respective counties wholly fail to comply with its requirements. This letter is a plain disapproval by the Commissioner of the lists of two of the counties then on file in the General Land Office, and a determination by him that other lists of like character would not be recognized. This letter is also the first direction from the Land Department to enter any selection of lands made by the state authorities upon the books of the Land Office, or to withhold them from sale or other disposition, and the stipulation of facts shows that the Surveyor General made no further report of swamp-land selections in either of the counties, and gave no direction to any of the local land offices to withhold any of the lands in question from sale or other disposition, as required by this letter.

Such was the status of the lands in question on August 30, 1864, when the map of definite location of the McGregor Western Railroad was filed, and the lands within the limits of the grant to that road withdrawn from the market, and it so remained until the passage of the act of March 5, 1872, entitled, "An act for the relief of Lucas and other counties in the state of Iowa," wherein it is provided:

"That the Commissioner of the General Land Office is hereby authorized and required to receive and examine the selections of swamp lands in Lucas, Dickinson, and such other counties in the state of Iowa as formerly presented their selections to the Surveyor General of the district including that state, and allow or disallow said selections and the indemnity provided for according to the acts of Congress in force touching the same at the time such selections were made." 17 Stat. 37, c. 39.

This is the first recognition by Congress of selections made by state authorities, and this only to the extent of requiring the Commissioner of the General Land Office to receive and examine and allow or disallow them and the indemnity provided for according to the acts of Congress in force when the selections were made. Whatever the purpose of this act, it was some eight years after the rights of the McGregor Western Railroad Company under the grant of May 12, 1864, had attached, and does not operate retrospectively to affect that grant.

In Railroad Co. v. United States, 92 U. S. 733, 23 L. Ed. 634, above, it is held that congressional grants of public lands are confined to those the title of which is complete in the United States; and in Newhall v. Sanger, 92 U. S. 761, 23 L. Ed. 769, it is said:

"The words 'public lands' are habitually used in our legislation to describe such as are subject to sale or other disposal under general laws."

The title of the United States to the lands in question was complete on May 12, 1864, and at the time of the definite location of the road under the provisions of the act of that date no claims or rights of any kind to any of said lands had been previously recognized by any authority of the United States, save under said act. The lands, therefore, might have been sold by the United States, or the right of preemption of homestead entry might have attached to them at any time

before the definite location of the road, and the complete title thereto would have passed under such sale, or under such entries, if they were subsequently perfected.

Some stress is laid by counsel for the government upon an admission in paragraph 17 of the answer:

"That at the date of the definite location of the McGregor Western Railroad, all the lands mentioned in the complainants' Exhibit 'A' [the lands in question] purported to have been selected and claimed on behalf of the state of Iowa as swamp and overflowed lands."

But this is only an admission that the lands were "purported to have been so selected and claimed by the state authorities," and not that they had been approved by any authority of the United States. The admission must be construed in connection with the other parts of the answer, which explicitly controvert the allegations of the bill, that these lands were excluded from the operation of the grant of May 12th.

The conclusion, therefore, is that the lands in question were not on August 30, 1864, segregated from the public domain, and that they passed under the grant of May 12th of that year, and were rightly patented to the defendant. This renders it unnecessary to consider the other question presented. The bill should therefore be dismissed, and it is so ordered.